

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 16, 2025

**BY ECF AND EMAIL**
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

      Re: *United States v. Jadhian Cordero*, S2 25 Cr. 417 (JSR)

Dear Judge Rakoff:

      The Government respectfully submits this letter in opposition to defendant Jadhian Cordero's bail application in the above-captioned case. The defendant is charged in connection with his participation in the armed robbery of a drug dealer and a machinegun shooting in broad daylight on a public street in East Harlem, which resulted in the shooting and killing of an innocent bystander—a 69-year-old woman standing on the sidewalk with her walker. In light of the incredibly serious and dangerous nature of these offenses; the defendant's history and characteristics, which include a prior firearms charge; and the overwhelming strength of the evidence in this case, the defendant cannot overcome the presumption of detention to assure his appearance and the safety of the community. Accordingly, this Court should deny his bail application.

    **I.**    **Background**

      On August 27, 2025, Jadhian Cordero, Faisil McCants, and Nasir Parsons engaged in a broad daylight robbery and shooting in a busy residential and commercial area of Manhattan. Less than approximately one hour before the robbery, surveillance video shows that Cordero and Parsons entered Parsons' apartment building on Lexington Avenue, less than one mile away from the site of the robbery and shooting. Cordero was dressed in the clothing he wore for the robbery: a black hooded sweatshirt, black sweatpants, and a face mask, which was at that time resting just under his nose. Still images from surveillance video showing Cordero and Parsons walking toward

Parsons' apartment building, as well as a close up of Cordero in front of Parsons' apartment building, are below:




Cordero and Parsons went upstairs to Parsons' apartment, where Parsons changed clothes from his brightly-colored green t-shirt and khaki pants into the clothing that Parsons wore for the robbery: a navy sweatshirt, gray pants, and black shoes. While in the elevator heading back outside, surveillance video shows that Parsons and Cordero both wore their hoods up over their heads:



Importantly, though, Cordero's distinctive left hand tattoo—clearly shown in photos of Cordero taken at the time of his arrest (at right)—is visible on surveillance video from the elevator of Parsons' apartment building (at left):

 

After leaving Parsons' apartment building, Cordero and Parsons went to McCants' apartment building, which is part of the New York City Housing Authority's ("NYCHA") Johnson Houses and is located just three blocks from the robbery and shooting. Cordero—again visible on surveillance video with his mask below his nose (below)—and Parsons waited for McCants to come out, and then all walked in the direction of the robbery.

 

Then, at about 12:20 p.m., Cordero, McCants, and Parsons approached a marijuana dealer on a lawn chair outside of a deli on the corner of East 109th Street and Madison Avenue. They first walked by the man—staring directly at him as they passed—and went around the corner of

the deli. While around the corner, Cordero, McCants, and Parsons engaged in a conversation, and McCants reached into his right sweatshirt pocket, gripped an item inside, and started walking back towards the deli. The trio then turned around the corner and confronted the drug dealer. McCants grabbed one of the man's backpacks and a physical altercation between McCants, Cordero (circled in red in the picture in the top row), and the man spilled into the middle of the street. During the altercation, in the middle of a busy street, in the broad daylight, McCants brandished a machinegun, as shown in the below surveillance video stills:






Cordero, McCants, and Parsons then fled northbound on Madison Avenue with two stolen backpacks of marijuana. The marijuana dealer chased after them. After fleeing down the block, McCants handed off to Cordero one of the backpacks they stole, and Cordero continued running. Still images from surveillance video showing Cordero accepting the stolen backpack from McCants capture both Cordero's face—with his mask once again below his nose—as well as his distinctive hand tattoo:




About a minute after the robbery, McCants pulled a machinegun from his pocket and, pointing it down the street in the general direction of the marijuana dealer, fired fifteen rounds in two bursts of gunfire—striking and killing a 69-year-old woman waiting at the streetcorner with her walker (the "Victim"). The still image at left, from surveillance video, shows McCants discharging the machinegun, while the photograph at right shows cones marking the locations of the shell casings littering the ground near the site of the shooting:




Following the shooting, Cordero, McCants, and Parsons then fled to Cordero's mother's

apartment (the "Cordero Apartment")—where Cordero also resided—with the two stolen backpacks and the firearm. The Cordero Apartment, located only a few blocks from the robbery and shooting, is—like McCants' apartment—in a building that is part of the NYCHA Johnson Houses.

On December 11, 2025, Cordero was arrested at the Cordero Apartment, where he continued to reside with his mother. Cordero was presented before United States Magistrate Judge Barbara Moses that same day. The defense now proposes that Cordero be released on conditions principally including home detention in the Cordero Apartment; supervision by Cordero's mother (with whom Cordero resided in the Cordero Apartment at the time of the robbery and shooting) as a third-party custodian; and a bond signed by two financially responsible persons.

## II. Applicable Law

The Court must consider four factors when deciding a bail application: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). As to the defendant's history and characteristics, the Court must consider, among other things, whether the defendant was on release pending trial for an offense under Federal, State, or local law. *See* 18 U.S.C. § 3142(g)(3)(B).

The Court must order detention where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The Court may order detention based on risk of flight or danger to the community. In other words, the Court "does not need to find both bases are proven in order to order a defendant's detention." *United States v. Epstein*, 19 Cr. 490 (RMB), 2019 WL 3229190, at *4 (S.D.N.Y. July 18, 2019). The Government must show "by clear and convincing evidence that the defendant presents a danger to the community." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (internal quotation marks omitted). The Government must establish that the defendant presents a risk of flight "by the lesser standard of a preponderance of the evidence." *Id.* (internal quotation marks omitted).

Where, as here, a defendant is charged with an offense under 18 U.S.C. § 924(c), there is a mandatory presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3). The defendant bears the burden of producing evidence to rebut the presumption in favor of detention in this case. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). But even if a defendant satisfies that initial burden, the presumption does not vanish; instead, it "remains a factor to be considered among those weighed by the district court." *Id*.

Finally, the Government may meet its burden "by proffer alone." *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (internal quotation marks omitted). "[B]ail hearings are typically informal affairs, not substitutes for trial or discovery" and so "courts often base detention decisions on hearsay evidence." *United States v. Abuhamra*, 389 F.3d 309, 321 n.7 (2d Cir. 2004) (internal quotation marks omitted).

**III. Discussion**

As set forth below, the defendant cannot overcome the statutory presumption in favor of detention in this case: his release would pose a clear danger to the community and a risk of non-appearance.

*First*, the nature and circumstances of the crimes charged in the Indictment are incredibly serious and extremely dangerous to the community—indeed, the crimes in which Cordero participated resulted in the violent death of an innocent person and endangered the lives of countless others.

Cordero is charged with one count of Hobbs Act Robbery, in violation of 18 U.S.C. §§ 1951 and 2, and one count of use, carrying, and possession of a firearm, in violation of 18 U.S.C. §§ 924(c) and 2, for participating in a brazen, gunpoint robbery outside of a deli in the middle of the day on a busy Manhattan street. This robbery led directly to the shooting and killing of an utterly innocent woman down the block. When she was brutally gunned down, the Victim was simply waiting on a streetcorner, just as New Yorkers do every day. In addition, numerous people, including young children in strollers,[1] were present and could have been harmed or killed by Cordero, McCants, and Parsons' egregious conduct on a busy Manhattan block in the middle of the day, as people were walking, running errands, and working nearby.

Cordero's high degree of culpability and his willingness to participate in violent, dangerous conduct is plain. Although he was not the shooter, Cordero was a critical and intentional participant in the robbery. Cordero met up Parsons and McCants ahead of the robbery, already clad in a mask and black hoodie, and accompanied Parsons while Parsons changed into a similar dark hoodie, with both men pulling the hoods up over the heads. During the robbery itself, Cordero willingly jumped into the physical altercation between the drug dealer and McCants in the middle of the street. Cordero pushed the dealer, nearly knocking him over, while McCants had a machinegun brandished. Cordero's actions allowed Cordero, McCants, and Parsons to grab the dealer's backpacks and flee—directly preceding the firing of the machinegun and the victim's death. Further, according to witness statements and other evidence, Cordero was aware that McCants was carrying a firearm when the three co-conspirators met outside of McCants' apartment building. The violent nature and circumstances of the defendant and his co-conspirators' heinous offense—and, in particular, the defendant's decision to participate in a daytime robbery with an armed co-conspirator on a public street—weighs heavily in favor of detention. While the defense suggests otherwise, there is no requirement that a defendant be the "leader of any group" or "physically possess or fire the gun" to be detained. (Br. at 4). Cordero's release would pose a danger to the community even in the absence of those things, in light of the nature of the crime, and he cannot overcome the presumption in favor of detention.

---

[1] A man pushing a child in a stroller passed right in the line of the gunfire only a few minutes before the shooting.

*Second*, the proof against the defendant is overwhelming. The Government's evidence includes video surveillance footage capturing nearly every step of the crime—the co-conspirators meeting up beforehand, the robbery itself, the shooting, and their flight back to the Cordero Apartment afterwards. Despite his attempt to wear a mask, most of Cordero's face is repeatedly visible on surveillance video, as is his distinctive hand tattoo. Cordero's face and/or hand tattoo are captured, for instance, inside the elevator of Parsons' apartment building before the crime; outside McCants' apartment building when meeting up with McCants; and in the course of the co-conspirators' flight from the robbery, as McCants handed off to Cordero the stolen backpack—freeing up McCants to carry out the shooting. Moreover, surveillance video shows that all three co-conspirators returned, with the stolen backpacks, to the Cordero Apartment building—where NYCHA records show that Cordero resides (and where, as discussed below, he requests to remain on home detention). The Government's evidence also includes social media evidence, law enforcement and other records, and witness statements, among other things.

*Third*, the history and characteristics of the defendant also weigh in favor of detention. Witness statements and other evidence establish that the Cordero, McCants, and Parsons are members of Sex Money Murder, a Bloods set that operates in, among other places, the Johnson Houses. And despite his lack of adult convictions, Cordero's criminal history nevertheless supports detention. First, according to law enforcement records, Cordero was arrested in March 2022, when he was sixteen years old, for possession of a firearm. There, Cordero was arrested at the corner of East 112th Street and Lexington Avenue, right next to the Cordero Apartment building. The investigation determined that the firearm in Cordeo's possession had been stolen and was loaded. Less than a year later, in February 2023, a New York Police Department ("NYPD") investigation indicated that McCants committed a shooting at a public basketball court down the block from Cordero's apartment building—and that Cordero was with McCants around the time of the shooting. In that instance, around the time of the shooting, an individual wearing dark clothing and a white facemask—who was later identified on surveillance video by the NYPD as McCants—exited Cordero's apartment building with two other individuals. One of them was identified as Cordero.[2] At bottom, this is not Cordero's first time engaging in criminal activity and specifically, criminal activity involving a firearm near the Cordero Apartment building—where, as described below, is exactly where defense counsel proposes he be released.

Considering these factors, detention is required to protect the community's safety. And, certainly, the bail conditions proposed by Cordero—that is, his release on bond to reside on home detention at the Cordero Apartment, supervised by his mother—are wholly inadequate to assure the safety of the community.

---

[2] About twenty minutes after the shooting, Cordero was stopped by law enforcement inside the Cordero Apartment building wearing clothing that matched that on the surveillance video of the shooting (including distinctive black and white striped pants with extra-long white drawstrings). The Government spoke to the NYPD Detective who conducted the stop of Cordero in February 2023, who stated that based on her observations of the surveillance video and her interaction with Cordero that night, she believed Cordero was the individual in the surveillance video of the shooting.

To start, Cordero proposes that returning to live right where he was living when he committed the instant crimes. In fact, the Cordero Apartment is precisely where Cordero fled with McCants and Parsons right after the robbery and shooting. The Cordero Apartment is also where Cordero lived when he possessed a stolen, loaded firearm in 2022 and engaged in a prior shooting with McCants in 2023. Cordero engaged in all of this criminal conduct—including the instant offenses—within a few blocks' radius of the Cordero Apartment that the defense now proposes he be released to. This is perhaps unsurprising, because the Government understands that the Bloods set of which Cordero, McCants, and Parsons are members, Sex Money Murder, operates out of the Johnson Houses, of which Cordero's apartment building is a part.

There is simply no reason to believe that returning Cordero to the same apartment where he was residing when he committed the heinous crimes with which he stands charged would somehow prevent him from engaging in further criminal conduct. In fact, Cordero's proximity to the Cordero Apartment, situated in an apartment complex out of which his gang operates and in the vicinity of which he has engaged in dangerous criminal conduct, has proven to be a catalyst for criminal activity.

Similarly, there is no basis whatsoever to believe that Cordero's mother's purported supervision of Cordero will reasonably assure the safety of the community. Cordero already lived in the Cordero Apartment with his mother at the time of the instant crimes, as well as the prior incidents described above—which clearly did not stop his participation in serious criminality.[3] Further, the Government understands that when Cordero, Parsons, and McCants fled to the Cordero Apartment after the shooting to avoid apprehension, bringing with them the stolen backpacks and the machinegun, Cordero's mother was present in the apartment at that time.[4] ███████████████████████████████████████████████████████████ imply put, the notion that Cordero's mother can ensure his compliance with the law and conditions of pretrial release is completely undercut by his participation in an armed robbery and fatal shooting while already living in the home—and nothing in the defense submission suggests otherwise.

On these facts, the defense cannot overcome the presumption in favor of detention. The Second Circuit has made clear that home confinement and electronic monitoring are inadequate to safeguard against defendants posing a threat to their communities. *See, e.g., United States v. Mercedes*, 254 F.3d 433, 437 (2d Cir. 2001); *United States v. Cinquemani*, 100 F.3d 941, 941 (2d Cir. 1996). And here, these bail conditions would not effectively protect the community in any real way. Similarly, although a bond may be relevant to the question of flight, it "will not secure the safety of the community." *United States v. Rodriguez*, 950 F.2d 85, 89 (2d Cir. 1991). *See also*

---

[3] In fact, when Cordero was arrested with a loaded firearm in 2022, he is reported to have told the arresting officer, "don't tell my mom about the gun".

[4] ███████████████████████████████████████████████████████████

*United States v. Ferranti*, 66 F.3d 540, 543 (2d Cir. 1995) (noting that a $1,000,000 bond would deter flight but not danger).

*Finally*, although the Government is primarily concerned with the danger Cordero poses to the community, Cordero's release also poses a risk of non-appearance, and he cannot overcome the presumption to that effect. The strength of the evidence, the potential sentence he faces, and his efforts to avoid arrest, indicate that Cordero has both a motive and a willingness to evade future court appearances if he were to be released. Cordero is currently facing a mandatory minimum term of imprisonment of ten years, and a maximum sentence of life. In addition, after the robbery and shooting and prior to Cordero's arrest on December 11, 2025, law enforcement took steps to locate him. But it appears that Cordero took steps to evade law enforcement detection, such as deleting his Instagram account. The robbery and shooting, that the police were looking for the three perpetrators, and the arrests of Cordero's co-conspirators were widely reported in the media, as well as discussed on the ground in the local community. There can be little doubt that Cordero, aware of these developments, took these steps to avoid police attention, rather than turn himself in.

## Conclusion

For the reasons set forth above, the Government respectfully requests that the Court deny the defendant's bail application.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Kathryn Wheelock
Alexandra Messiter
Brandon Harper
Assistant United States Attorney
(212) 637-2415 / -2544 / -2209

cc: Carla Sanderson, Esq. (via ECF)