# CARLA SANDERSON

**ATTORNEY**  NY, NJ, SDNY, EDNY

260 MADISON AVENUE  FL 22 | **T** 646.499.3818
NEW YORK, NEW YORK 10016 | **F** 646.499.3814
carla@carlasandersonlaw.com | carlasandersonlaw.com

April 30, 2026

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    *United States v. Jadhian Cordero*
S2 25 Cr. 417 (JSR)

Dear Judge Rakoff,

Jadhian Cordero respectfully submits this letter in anticipation of sentencing, which is scheduled for May 7, 2026. Mr. Cordero, age 19, comes before the Court for sentencing for his participation in a robbery after which his co-defendant brandished and discharged a firearm, killing an innocent bystander. Mr. Cordero has accepted responsibility for his role in this serious offense and feels significant remorse. Despite his traumatic childhood, described herein, Mr. Cordero is motivated and able to change and has already begun to use his incarceration to do so. A sentence of 84 months' imprisonment meets all of the goals of sentencing: it is sufficient punishment for his role, serves as sufficient deterrence, and protects the public while recognizing that Mr. Cordero, who was still a teenager when he committed this offense, has great capacity to rehabilitate over the years he will be incarcerated.

## I.    PROCEDURAL HISTORY

Jadhian Cordero was arrested on December 11, 2025, and charged in the instant case. On January 29, 2026, Mr. Cordero pleaded guilty to the lesser-included offense of Count Two of the Indictment, admitting that on August 27, 2025, in the Southern District of New York, Mr. Cordero knew and agreed that, during and in relation to a crime of violence — the Hobbs Act robbery charged in Count One — and a drug trafficking crime, his coconspirator brandished a firearm. This lesser-included offense carries a mandatory minimum term of 84 months' imprisonment.

## II.    LAW GOVERNING SENTENCING

18 U.S.C. § 3553(a) begins with the requirement that the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). As the Supreme Court reaffirmed in *Pepper v. United States*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)) (cited in *United States v. Delgado*, 971 F.3d 144 (2d Cir. 2020)).

In *United States v. Ministro-Tapia*, the Second Circuit explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) (observing that where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence). Importantly, Congress has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

## III.    THE 18 U.S.C. § 3553(a) FACTORS CALL FOR
## A SENTENCE OF 84 MONTHS' IMPRISONMENT

A sentence of 84 months' imprisonment is sufficient, but not greater than necessary, to achieve the purposes of sentencing under 18 U.S.C. § 3553(a). Mr. Cordero's youth, his documented childhood trauma, his acceptance of responsibility and his demonstrated capacity for rehabilitation all counsel against a sentence above the mandatory minimum.

### A. The History and Characteristics of Mr. Cordero

*Childhood Trauma and Abuse*

Jadhian Cordero was born in New York City, in 2006, to 18-year-old, Rosanna Cruz and, Ruddy Cordero, who was in his 30s. As detailed in the mitigation report prepared by Lisa Orloff, LMSW, ACSW, attached at Exhibit A, Mr. Cordero's childhood was defined by chaos, violence, and instability from his earliest years. Between the ages of three and seven, Mr. Cordero endured severe physical abuse at the hands of his mother's boyfriend, a cocaine and methamphetamine addict. Mr. Cordero was beat with leather belts, extension cords, and other household objects. The boyfriend extinguished cigarettes on Mr. Cordero's back and hands and threatened Mr. Cordero with a knife. Mr. Cordero's mother was subjected to life-threatening domestic violence throughout this period, and Mr. Cordero witnessed this violence firsthand. On one occasion, when Mr. Cordero was approximately seven years old, the boyfriend held Ms. Cruz and Mr. Cordero at gunpoint and threatened to kill them.

The violence did not end after that. Ms. Cruz's next boyfriend was also abusive. Mr. Cordero witnessed this man call his mother degrading names, disappear for weeks, and cycle in and out of jail. Mr. Cordero's uncle reported seeing Ms. Cruz with black eyes, bruises on her

neck, and a large lump on her forehead. The family was thrust into New York City's shelter system, where they remained for 567 days. Mr. Cordero described the shelter as "like a jail," and "in the trenches" where he was bullied and assaulted by older children, and where a man attempted to sexually assault his mother in his presence. Ms. Cruz was unable to protect Mr. Cordero and to provide a safe and stable home environment that every child needs.[1]

*Educational Disabilities and Parentification*

From the outset, the educational institutions available to Mr. Cordero reflected the same patterns of segregation and disinvestment that defined the neighborhoods where he lived. As a young child, Mr. Cordero attended P.S. 152 Dyckman Valley, in the Washington Heights/Inwood neighborhood of Manhattan. P.S. 152 is a Title I school where 94% of students are economically disadvantaged.[2] The school's diversity score of 0.27 is less than half the New York State average of 0.72, reflecting extreme racial and economic homogeneity. *Id.*

In elementary school, Mr. Cordero was diagnosed with cognitive and learning disabilities that impacted his ability to learn: ADHD at age seven, dyslexia at age nine, and mixed receptive-expressive language disorder at ages twelve and fourteen. *See* Orloff Report at 7-8. Teaches could not meet his complex needs and he was often mistreated. *Id.* at 9. His full-scale IQ was measured at 84, placing him in the 14th percentile. *Id.* at 8. The special education supports provided at his underserved school were woefully inadequate and were undermined by the instability and trauma that defined his family life. The Administration for Children's Services substantiated multiple cases of educational neglect against his mother due to Mr. Cordero's poor school attendance. *Id.* at 8.

*Life in East Harlem*

Mr. Cordero's family moved into the J.W. Johnson Houses, a New York City Housing Authority ("NYCHA") development in East Harlem in 2016. This neighborhood is one of the most underserved communities in New York City. Historically segregated by race and class, the neighborhood has among the highest concentrations of public housing in the nation, with residents disproportionately affected by poverty, unemployment, and violent crime. The Johnson Houses, where Mr. Cordero lived, like much of NYCHA's aging housing stock, have suffered from decades of chronic disinvestment, deferred maintenance, and deteriorating conditions. Mr. Cordero and his family were forced to live in a building that was not regularly cleaned and was plagued by vermin infestations and deteriorating infrastructure. It was in this environment, surrounded by poverty, violence, and neglect, that Mr. Cordero spent his formative years. He regularly witnessed people using drugs in and around his building. As the Second Circuit has recognized in analogous contexts, a defendant's exposure to violence and criminal activity from a young age, combined with a lack of guidance and a disadvantaged upbringing, are factors that

---

[1] The Presentence Investigation Report states that "[t]he defendant's reported and documented history of abuse during his formative years may warrant a sentence outside of the advisory guideline system." PSR ¶ 81.

[2] *See* Public School Review, P.S. 152 Dyckman Valley Profile, https://www.publicschoolreview.com/p-s-152-dyckman-valley-profile.

3

must be given meaningful weight under 18 U.S.C. § 3553(a)(1). *See United States v. Sawyer*, 907 F.3d 121, 124 (2d Cir. 2018) (holding that "the deplorable conditions of [defendant's] childhood should have militated in favor of a sentence less severe"); *see also United States v. Garner*, No. 15-3454-cr, slip op. at 4 (2d Cir. June 13, 2022) (summary order) (crediting defendant's childhood in a "poor and dangerous neighborhood" as a mitigating factor).

From 2021 through 2022, Mr. Cordero attended the High School for Climate Justice, on the border of East Harlem and the Upper East Side, a geographic line that is one of the starkest wealth divides in the country. Despite its proximity to some of the wealthiest areas in Manhattan, the High School for Climate Justice serves an overwhelmingly impoverished and segregated student body: 95% of students are racial minorities, and 90% are economically disadvantaged.[3] Mr. Cordero whose educational needs were still unmet, dropped out in the tenth grade to care for his mother, who has ███████████ and required Mr. Cordero's help with daily functions including bathing, grooming, dressing, toileting and caring for her younger son. Mr. Cordero was "parentified" as a teenager — forced to assume the role of caretaker for both his mother and his younger brother.

*Adverse Childhood Experiences and Mental Health*

Mr. Cordero presents with eight of ten recognized Adverse Childhood Experience (ACE) categories: (1) physical abuse; (2) emotional abuse; (3) emotional neglect; (4) witnessing domestic violence; (5) parental substance abuse; (6) parental mental illness; (7) parental separation; and (8) household instability and homelessness. *See* Orloff report at 11-12. This ACE score places Mr. Cordero in the highest-risk category for every negative outcome the research has identified, including depression, substance abuse, and criminal behavior. He was also diagnosed with PTSD in 2020, and shows signs of suffering from anxiety and depression.

Despite these circumstances, Mr. Cordero has demonstrated meaningful growth during the pendency of this case. He has proactively sought enrollment in the Non-Residential Drug Abuse Program (NRDAP) at MDC Brooklyn, submitting a formal written request on February 12, 2026. He has completed courses, when available, most recently a "Parenting" course. *Id.* at 13. He participated in a Psychology Services group session and received a "Good" participation rating. *Id.* He has incurred no disciplinary sanctions.

*Ms. Cordero Provided Necessary Care and Support for his Mother*

For many years, Mr. Cordero cared for his mother who was often physically unable to care for herself and her youngest son, due to her ███████████ Mr. Cordero's role as a caretaker for his mother constitutes strong grounds for a sentence of 84-months under 18 U.S.C. § 3553(a). The Second Circuit has held that the needs of vulnerable dependents may warrant a lower sentence. *See United States v. Johnson*, 964 F.2d 124, 128-30 (2d Cir. 1992).[4] Prior to his

---

[3] *See* U.S. News & World Report, High School for Climate Justice, https://www.usnews.com/education/best-high-schools/new-york/districts/new-york-city-public-schools/high-school-for-climate-justice-the-13096.

[4] While not applicable here due to the mandatory minimum, the sentencing guidelines also provide that a downward departure may be warranted for family circumstances. *See*

arrest, Mr. Cordero was caring for his mother on a daily basis; Mr. Cordero prepared daily meals, took his mother to medical appointments, helped his mother provide self-care when she was unable to do so, took his brother to school, and managed the family's living expenses. *See* PSR ¶ 45.

As Ms. Cruz explained to the Court, "because of my condition, I depend heavily on my son for daily support, Jadhian helps me move around, makes sure I take my medication, and assists in caring for his younger brother." *See* letter from Rosanna Cruz at Exhibit B; *see also* PSR ¶ 46 ("The defendant's mother corroborated that Cordero was helping to care for her after she began suffering from ███████████, accompanying her to medical appointments, grocery shopping, and performing various chores at home."). Ms. Cruz explained: "[Jadhian] is more than just my son — he is a caregiver and a source of strength in our home. His presence is extremely important to my health and to our family's stability." *See also* letter from Napoleon Aquino at Exhibit B ("[Jadhian] helps her with daily activities, including bringing her food and helping her when she is not feeling well. There have even been times when she has been hospitalized for long periods, and Jadhian has been there for her every step of the way. His family truly depends on him."); letter from Ramon Aquino at Exhibit B (Mr. Cordero is "a loving son, nephew, cousin, and uncle who has always been present for the family.").

## B. The Nature and Circumstances of the Offense

The details of Mr. Cordero's offense are described in the Presentence Investigation Report prepared by the Probation Department and will not be discussed at length herein. On August 27, 2025, Mr. Cordero and two others, one of which was armed with a firearm, determined by ATF analysis to be a machinegun, robbed an individual of a backpack containing marijuana. Mr. Cordero, who was aware that his codefendant Faisal McCants was armed, engaged in a physical altercation with the robbery victim. About two minutes later, surveillance video shows Mr. Cordero running east on 110th Street and turning the corner onto Park Avenue, out of sight. About ten seconds later, Faisal Mcants appeared, walking east on 110th Street by himself. Video depicts Mr. McCants turn around and fire his gun multiple times indiscriminately down 110th Street. Tragically, an innocent bystander was hit and killed by one of the bullets.

---

U.S.S.G. § 5H1.6. "The relevant factor in such departures is that an innocent party will be harmed by the defendant's incarceration . . . ." *United States v. DeRiggi*, 893 F. Supp. 171, 182 (E.D.N.Y. 1995); *see also United States v. Galante*, 111 F.3d 1029, 1032, 1035 (2d Cir. 1997) (affirming downward departure for family ties and responsibilities for married father of two where, *inter alia*, defendant, in addition to being the primary breadwinner, took care of children while his wife worked and defendant helped care for his chronically ill father); *United States v. Shabazz*, 1993 U.S. Dist. LEXIS 21079, 5 (S.D.N.Y. 1993) (downward departure to avoid the disintegration of the household where, *inter alia*, defendant and fiancée had custody of three children); *United States v. Rose*, 885 F. Supp. 62, 63 (E.D.N.Y. 1995) (downward departure of four levels where defendant assumed the role of surrogate father to four young second cousins, who were being raised by his maternal grandmother).

Though he did not personally possess the firearm or make the decision to fire the gun, Mr. Cordero acknowledges his role in the robbery that began the chain of events that led to the victim's tragic death. Mr. Cordero wrote in his letter to the Court, "I want to apologize to the victim and her family but don't know how to apologize for this. I can't imagine how it feels for the family who lost someone they love and they probably won't accept my apology because it will not bring her back but I am sorry. I accept responsibility for my role in this crime." *See* attached letter from Jadhian Cordero at Exhibit C.

### C. The Adolescent Brain: Mr. Cordero's Youth and Capacity for Rehabilitation

Jadhian Cordero was 18 years old when he committed the offense. The science of adolescent brain development is therefore directly relevant to this Court's sentencing determination. As this Court is aware, the brain does not finish developing until at least the mid-to-late twenties, and possibly into the early thirties and that the prefrontal cortex — the area responsible for judgment, impulse control, and consequential thinking — is one of the last regions to mature. *See United States v. Ramsay*, 538 F. Supp. 3d 407, 414-16 (S.D.N.Y. 2021) (Your Honor citing neuroscience research on adolescent brain development and observing that the prefrontal cortex is among the last brain regions to mature); *see also* Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 649-50 (2016). Adolescents take more risks at least partly because of this immature frontal cortex, and often prioritize peer relationships over consequences.

In *United States v. Ramsay*, this Court granted Mr. Ramsay's motion for a reduction in his sentence after considering Supreme Court case law recognizing that the Eighth Amendment "compels sentencing courts to consider offenders' relative youth when determining whether especially severe sentences can and should be imposed." *Ramsay*, 538 F. Supp. 3d at 412. Your Honor then considered the "four attributes of adolescence that the Supreme Court has identified as warranting special consideration in criminal sentencing" and "why and how these attributes of adolescence should influence sentences for young offenders." *Id.* at 413.

As this Court is aware, the Supreme Court has barred the harshest penalties for young offenders. *See Miller v. Alabama*, 567 U.S. 460, 471 (2012) (holding that "children are constitutionally different from adults for purposes of sentencing" because the "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders"); *see also Roper v. Simmons*, 543 U.S. 551, 570 (2005); *Graham v. Florida*, 560 U.S. 48, 68 (2010). While the constitutional line for Eighth Amendment purposes is drawn at age 18, *see United States v. Sierra*, 933 F.3d 95, 97 (2d Cir. 2019), the court in *Sierra* acknowledged that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id.* (quoting *Roper*, 543 U.S. at 574). Courts in this Circuit consider the *Miller* factors - immaturity, impetuosity, failure to appreciate consequences, family environment, and the possibility of rehabilitation – when sentencing those who committed crimes as adolescents. *See United States v. Portillo*, 981 F.3d 181, 186-87 (2d Cir. 2020); *see also United States v. Delgado*, 971 F.3d 144, 159 (2d Cir. 2020) (vacating sentence and remanding for resentencing for court to consider "the mitigating factors of youth").

As Your Honor explained in *Ramsay*, youth matters in sentencing. Due to adolescents' "immaturity, their susceptibility to peer influence, and their dependence" just punishment for an adolescent is "usually less severe" than for a similarly situated adult and the value of deterrence

6

is lessened. *Ramsay*, 538 F. Supp. 3d at 423. Moreover, due to their "slow but steady development of means of self-control," the "need to incapacitate applies with less force to younger offenders because, as noted, adolescent crime is a poor predictor of future criminal behavior;" and rehabilitation and successful reintegration into society is "more likely than for similarly situated adult offenders." *Id.*

The Sentencing Guidelines amendments passed in November 2024 include a policy statement in U.S.S.G. § 5H1.1 that provides strengthened language regarding a defendant's "youthfulness." The amended policy statement explains that a downward departure "may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses," and identifies specific risk factors that "may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems:"

> Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation. The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age.

Every one of these risk factors — adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships — applies to Mr. Cordero. Moreover, Mr. Cordero's brain was not merely immature in the way that every 18-year-old's brain is immature. His prefrontal cortex developed under years of chronic trauma — domestic violence, shelter instability, parentification, untreated ADHD, dyslexia, mixed receptive-expressive language disorder, and chronic stress. However, the science of neuroplasticity demonstrates that these adaptations are not permanent. The brain wires itself based on childhood experience; when that experience includes trauma, the brain adapts to survive adversity — but it retains the capacity to heal and grow. Mr. Cordero presents with eight of ten recognized Adverse Childhood Experiences. However, as the research shows, Mr. Cordero's brain will continue to mature and enable him to make better choices. Because of Mr. Cordero's young age he has "diminished culpability and greater prospects for reform," and is "less deserving of the most serious punishments." *Miller*, 567 U.S. at 471.

### D. The Conditions of Mr. Cordero's Pretrial Detention at MDC Brooklyn

Mr. Cordero has been incarcerated at the Metropolitan Detention Center in Brooklyn since his arrest on December 11, 2025. The dangerous and deplorable conditions at the MDC are well-documented and have been cited by judges in both the Southern and Eastern Districts of New York as a basis for imposing below-Guidelines sentences. *See United States v. Chavez*, No. 22-CR-303 (S.D.N.Y. Jan. 4, 2024); *United States v. Colucci*, No. 23-CR-417 (E.D.N.Y. Aug. 5, 2024). These conditions are not abstract — they directly affect Mr. Cordero, one of the youngest inmates in the MDC. He is a 19-year-old who has never before been imprisoned, with

diagnosed learning disabilities and mental health struggles. The PSR notes that Mr. Cordero is not presently enrolled in an educational or vocational program. However, he has proactively sought enrollment in the NRDAP drug treatment program, and was placed on a waitlist and told he will be contacted when the program returns to open enrollment status on his housing unit. He has enrolled in classes when available. The MDC's well-documented inability to provide adequate programming, mental health treatment, and basic humane conditions means that Mr. Cordero's pretrial detention has been significantly harsher than what would be experienced at a properly functioning facility.

### E. An 84-month sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public and avoids unwarranted sentencing disparities (18 USC § 3553(a)(2)(A)-(C), (6))

Mr. Cordero is a 19-year-old who has accepted responsibility for his offense, maintained excellent behavior at the MDC Brooklyn and shown that he is ready to take his rehabilitation seriously. A sentence of 84 months' imprisonment is sufficient - the Probation Department agrees and recommends that Mr. Cordero be sentenced to the mandatory minimum. The experience of arrest, remand, and incarceration at the MDC Brooklyn since December 11, 2025, has made a profound impact on Mr. Cordero. His engagement with Ms. Orloff during difficult invasive interviews, his proactive pursuit of drug treatment programming, and his growing insight into the connection between his childhood trauma and his criminal conduct all demonstrate that further incarceration beyond the mandatory minimum is not necessary for specific deterrence.

As to protection of the public, 84 months is a sufficient sentence. With appropriate programming — including the GED classes, RDAP, and mental health treatment — Mr. Cordero will have the opportunity to develop the skills he was denied as a child and re-form the maladaptive coping mechanisms he used. The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. U.S.S.G. § 5H1.1 (Nov. 2024); *see also Ramsay*, 538 F. Supp. 3d at 423 (observing that "adolescent crime is a poor predictor of future criminal behavior"). A sentence of 84 months provides ample time for Mr. Cordero to mature, receive treatment, and prepare for reentry.

Finally, an 84-month sentence will not create an unwarranted sentence disparity. While Mr. Cordero was a knowing participant in the robbery and should be sentenced accordingly, he did not physically possess or chose to fire the machine gun, killing an innocent victim. As the government noted, "a person who chooses to discharge a machinegun—and certainly a person who kills a bystander in doing so—must expect that he will be subject to a significantly lengthier sentence than a person who engages in the serious but still far less culpable conduct of merely possessing the gun." *See* Gov. Ltr. ECF Doc. No. 35, Filed 4/28/2026 at 5. Punishing Mr. Cordero with additional incarceration beyond 84 months is not necessary.

## IV. CONCLUSION

It is respectfully submitted that a sentence of 84 months' imprisonment is "sufficient, but not greater than necessary" to achieve the sentencing purposes in 18 U.S.C. § 3553(a).

Dated: April 30, 2026

Respectfully submitted,

/s/

Carla M. Sanderson