

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 30, 2026

**By ECF**
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> **Re:    *United States v. Jadhian Cordero*, S2 25 Cr. 417 (JSR)**

Dear Judge Rakoff:

The Government respectfully writes in advance of the sentencing of defendant Jadhian Cordero in the above-captioned case, which is scheduled for May 7, 2026.  For the reasons set forth below, the Government submits that a sentence of 120 months' imprisonment is sufficient but not greater than necessary to serve the purposes of sentencing in this case.

## I.    Background

### A.  Offense Conduct

The defendant stands convicted of brandishing a firearm, and aiding and abetting the same, in connection with the midday robbery of a marijuana dealer in East Harlem, New York. (Presentence Investigation Report ("PSR") ¶¶ 8–16).

On August 27, 2025, shortly before 12:30 in the afternoon, a marijuana dealer ("Individual-1") was sleeping on a lawn chair in front of a deli near the corner of East 109th Street and Madison Avenue in East Harlem, New York.  (*Id.* ¶ 10).  The defendant, wearing all black with his hood pulled up and a face mask, and his co-conspirators, Nasir Parsons and Faisil McCants—also wearing hoods and face masks—walked toward and then past Individual-1. (*Id.* ¶¶ 10–11).  After walking by Individual-1, the defendant, Parsons, and McCants walked around the corner where they had a brief conversation amongst themselves.  (*Id.* ¶ 11).  McCants, standing nearby the defendant, reached into his sweatshirt pocket and gripped an item inside his pocket—subsequently revealed to be a machinegun (the "Machinegun").  (*Id.*).  The defendant, Parsons, and McCants then walked back to the front of the deli.  (*Id.* ¶ 12).

Once in front of the deli, McCants, flanked by the defendant and Parsons, woke up Individual-1.  (*Id.*).  McCants asked Individual-1 if he had any marijuana for sale before demanding that Individual-1 hand over his backpack, which contained marijuana.  (*Id.*).  The defendant, Parsons, and McCants then engaged in a physical altercation with Individual-1, during which the Machinegun was brandished while they fought with Individual-1 in the middle of the street.  (*Id.*

1

¶ 13).  In particular, the defendant and McCants knocked Individual-1 to the ground, while McCants brandished the Machinegun.   The defendant, Parsons, and McCants grabbed two backpacks containing marijuana from Individual-1 and fled, while Individual-1 followed them in pursuit.  (*Id.*).  Surveillance video footage shows that, as they ran down the sidewalk, McCants handed one of the backpacks to the defendant, who continued to flee with it.

McCants, with the defendant fleeing just ahead of him, then pulled out the Machinegun from his sweatshirt pocket and, standing on the sidewalk, fired 15 rounds in the general direction of Individual-1.  (*Id.* ¶ 14).  At the time that McCants fired the Machinegun, a 69-year-old woman ("Victim-1") was standing with a walker on the sidewalk, near the corner of East 110th Street and Madison Avenue.  (*Id.*).  She was struck by a bullet and fell to the ground.  (*Id.*).  Victim-1 was transported to the hospital, where she was pronounced dead.  (*Id.*).  Doctors determined that the bullet—which entered Victim-1's body through her left shoulder and traveled to her lung—caused Victim-1 to go into cardiac arrest.  (*Id.*).

Surveillance video footage shows that, after the shooting, the defendant, McCants, and Parsons then fled to the defendant's residence with the two stolen backpacks and the firearm.

## II.    Procedural History

In December 2025, the defendant was charged by Superseding Indictment with Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951, and use, carrying, and possession of a machinegun, which was brandished and discharged, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), (ii), (iii) and (B)(ii), and aiding and abetting the same, in violation of Title 18, United States Code, Section 2.

On January 29, 2026, the defendant pleaded guilty to use, carrying, and possession of a firearm, which was brandished, pursuant to a Plea Agreement.  In the Plea Agreement, the parties set forth a stipulated Guidelines sentence ("the Stipulated Guidelines Sentence") of 84 months' imprisonment, which is the statutory mandatory minimum term of imprisonment.  The Probation Offices concurs with the parties' Guidelines calculation.  (PSR ¶¶ 26–27).

## III.    Discussion

### A.  Applicable Law

Since *United States v. Booker*, the Guidelines are advisory, providing sentencing courts with a recommendation.  543 U.S. 220 (2005).  *Booker* held that although the Guidelines are not mandatory, courts must "consult" them during sentencing.  *Id.* at 264.  The Guidelines provide "the starting point and initial benchmark" for sentencing.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Thereafter, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) relevant policy statements by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims."  18 U.S.C. §§ 3553(a)(1)-(7); *Gall*, 552 U.S. at 50 & n.6.

The statute directs judges to impose sentences sufficient to "comply with the purposes of sentencing."  This analysis requires the consideration of the following sentencing goals:

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

A sentencing court may consider "any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." *Wasman v. United States*, 468 U.S. 559, 563-64 (1984); *accord Pepper v. United States*, 562 U.S. 476, 488 (2011). "Highly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Williams v. New York*¸ 337 U.S. 241, 247 (1949).  Sentencing judges regularly consider a defendant's risk of recidivism and failure to be deterred by previous sentences. *See, e.g., United States v. Moore*¸ 17 Cr. 7 (JGK), 2022 WL 934061, at *2 (S.D.N.Y. Mar. 29, 2022).

## B.  A Sentence of 120 Months' Imprisonment is Warranted

In the circumstances of this case, a sentence of 120 months' imprisonment is appropriate punishment, and no greater than necessary, for the defendant's extremely serious criminal conduct. This sentence is amply warranted to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to provide adequate specific and general deterrence.

*First*, as to the nature and circumstances of the offense, the defendant stands convicted of possessing, and aiding and abetting the possession of, a firearm, which was brandished, during a midday armed robbery on a populated Manhattan street corner.  The robbery in which the defendant chose to participate—clad in a hood and mask—led directly to the shooting and killing of an utterly innocent woman down the block.  When she was brutally gunned down, Victim-1 was simply waiting on a street corner, just as New Yorkers do every day.  In addition, numerous people were present in the vicinity of the shooting and could have been harmed or killed.  The defendant's decision to participate in an armed robbery on a busy Manhattan block in the middle of the day, as people were walking, running errands, and working nearby, is egregious criminal conduct that demands a serious sanction.

To be sure, the defendant himself did not pull the trigger of the firearm that killed Victim-1.  Nonetheless, the defendant's high degree of culpability and his willingness to participate in the violent, dangerous conduct that led to the victim's death are plain.  The defendant was a critical

3

and intentional participant in the robbery. The defendant met up with Parsons and McCants ahead of the robbery, already clad in a mask, black sweatpants, and black hooded sweatshirt on an August day. During the robbery itself, the defendant willingly jumped into the physical altercation between the drug dealer and McCants in the middle of the street. The defendant pushed the drug dealer, nearly knocking him over, while McCants had a machinegun brandished. The defendant's actions allowed him and his co-conspirators to grab the drug dealer's backpacks and flee—directly preceding the firing of the machinegun and Victim-1's death. By participating in a violent robbery involving a gun, on a crowded public street, the defendant created a situation where dangerous and even deadly violence was an eminently foreseeable result. The harm of this criminal conduct does not hinge on who pulled the trigger; it stems from the shared decision to engage in a dangerous crime that predictably puts lives at risk. As this Court observed during the defendant's bail argument in this case, "while [the defendant's] role may be that of an accomplice rather than the person who fires the gun, the extent of his knowing participation in violent activity seems to me clear." (Dec. 16, 2025 Tr. at 10). The violent nature and circumstances of the defendant and his co-conspirators' heinous offense—and, in particular, the defendant's decision to participate in the daytime robbery of a drug dealer with an armed co-conspirator on a public street—calls for a very significant sentence.

*Second*, as to the history and characteristics of the defendant, it is crucial to note that this is not the defendant's first time possessing a firearm. Cordero was arrested in March 2022, when he was sixteen years old, for possession of a firearm. (PSR ¶ 34). In fact, Cordero was arrested with that firearm at the corner of East 112th Street and Lexington Avenue—that is, in the same area where he engaged in the instant armed robbery and where Victim-1 was killed. (*Id.*) The investigation determined that the firearm in the defendant's possession had been stolen and was loaded. (*Id.*) This history evinces a pattern of knowingly engaging in unlawful and dangerous behavior involving firearms, rather than a one-time lapse in judgment. Indeed, the instant offense reflects an escalation in the defendant's criminal activities. More than two years after possessing a loaded firearm on the street in East Harlem, the defendant and his co-conspirators—again armed with a loaded gun—participated in an armed drug robbery on an East Harlem street corner, resulting in a physical altercation with the robbery victim and the death of an innocent bystander. During the defendant's bail argument, this Court—considering the defendant's prior firearm possession, his history of gang membership, and his presence with McCants around the time of a 2023 shooting at a public basketball court for which McCants was subsequently arrested—correctly concluded that "[t]he sad fact is that this defendant has involved himself through . . . much of his adolescent years in gang and criminal activity involving extreme violence." (Dec. 16, 2025 Tr. at 10). This repeated criminal conduct reflects a strong need for the sentence imposed to provide adequate deterrence and to protect the public from further crimes of the defendant.

*Third*, a 120-month sentence will promote respect for the law and afford much-needed deterrence to lawless and deadly gun violence. New Yorkers must feel free to walk down the street at lunchtime without fear that they will be gunned down by a machinegun's bullet. And individuals who unlawfully possess firearms and participate in robberies and other violent crimes involving firearms must understand that, by endangering the safety of the community and creating the risk of terrible violence, they are exposing themselves to severe criminal consequences. Indeed, a sentence above the mandatory minimum is appropriate because the mandatory minimum sentence does not take into account the specific facts of this case—that an innocent person died as a result

4

of the offense and that this was not the defendant's first time possessing a firearm. *See United States v. Ben-Jochannan*, No. 24-1573-CR, 2025 WL 2985745, at *2 (2d Cir. Oct. 23, 2025) (determining that a sentence twice as long as the Guidelines was substantively reasonable for 924(c) conviction where the offense involved murder; noting that the 924(c) Guidelines "simply recommend imposing the mandatory minimum term of imprisonment" under which "[a]ggravating and mitigating factors are not considered" such that "[t]here is . . . no difference between the recommended sentence for a defendant convicted of discharging a firearm by firing the weapon into the air, causing no injury, and the recommended sentence for a defendant . . . who discharged a firearm directly at a victim with the intent to kill him"). A sentence above the mandatory minimum in this case is warranted to adequately promote respect for the law and afford much-needed deterrence to deadly gun violence on the streets of New York City.

## IV.    Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence of 120 months' imprisonment is sufficient but not greater than necessary.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:            /s/

Brandon D. Harper/Alexandra S. Messiter/Kathryn Wheelock
Assistant United States Attorneys
(212) 637-2209

5